## Horridge v. Badman

*Bernard J. Hendrzak* and *James M. Reinert,* for plaintiffs.

*Nathan Hyman* and *Donald S. Mills,* for defendants.

PINOLA, P. J., August 10, 1966.—Plaintiffs seek to set aside a deed to property sold to them by defendants because of fraudulent representations with reference to the extent of the property.

STATEMENT OF PLEADINGS AND ISSUE RAISED

The pleadings consist of a complaint and answer. The issue involved is whether the sale of the property by defendants to plaintiffs should be set aside and the consideration returned because of fraudulent representations by defendants as to the boundaries of the property.

From the evidence, we make the following

FINDINGS OF FACT

1. Plaintiffs, John Horridge and Violet Horridge, are husband and wife, residing at 11 Harris Place, Laurel Run Borough.

2. Defendants, Arthur W. Badman and Cora E. Badman, are husband and wife, residing at 60 Dieble Avenue, Wilkes-Barre.

3. Defendants acquired title to certain property from the Lehigh Valley Coal Company et al., by deed dated January 25, 1951, and recorded in Luzerne County on May 23, 1951, in deed book 1116, page 429, as follows:

"All that certain piece or lot of land situate in Wilkes-Barre Township, Luzerne County, bounded and described as follows:

"Beginning at a point in the line between lands of Lehigh Valley Coal Company and Glen Alden Coal Company, being also the point on intersection of the northerly right-of-way line of State Highway Route 170, section 17, with the said land line:

"Thence along said land line North 46 degrees 3 minutes West, two hundred thirty (230) feet, more

or less, to a corner in said line, being also a point in the southerly side of the Barrachman or Ashley Road:

"Thence along said road and the line between the said Coal Companies' lands, North 82 degrees 30 minutes East, two hundred twenty-five (225) feet, more or less, to a point, the beginning of a curve in the right-of-way line of the said Barrachman or Ashley Road leading to the highway aforesaid;

"Thence along said right-of-way line by a curve to the right, eighty (80) feet, more or less, to its junction with the first above mentioned highway right-of-way line;

"Thence along said highway right-of-way line South 34 degrees 40 minutes West, one hundred fifty (150) feet, more or less, to the place of beginning.

"Containing twenty-six thousand one hundred thirty-six (26,136) square feet, or sixty one-hundredths (0.60) acre, more or less".

The above described premises were conveyed by defendants to plaintiffs subject to an easement granted the Commonwealth of Pennsylvania on February 25, 1966, as outlined on map recorded in Luzerne County Map Book 20, page 7. The grantors specially warranted the property conveyed.

4. Sometime in 1963, the Commonwealth of Pennsylvania, Department of Highways, condemned a portion of that property for the widening of route 309 in connection with the construction of new Interstate route 81.

5. There is no description of the property condemned in map book 20, page 7, referred to in the deed from defendants to plaintiffs.

6. The remaining portion was offered for sale through realtors, Nobel & Walters, Inc.

7. On May 5, 1965, plaintiffs went on the premises, examined the building and generally observed the land.

8. On that date, defendant Badman indicated the

front line along route 309 by waving his hand in a northerly direction and pointed to a post in the front line which he said was distant nine feet from the right-of-way of route 309.

9. Defendant Badman told the male plaintiff, when he was showing him the property, that the front sidewalk ran to the road, route 309.

10. On August 9, 1965, plaintiffs entered into an agreement purchasing said property from defendants through their agents, Nobel & Walters, Inc., said agreement being marked exhibit "A" and attached to the complaint.

11. In said agreement, the property is described as "Corner of Ashley Street and Route 309, an irregular shaped parcel of land with a frontage approximately 225 feet and a total area of approximately 16,906 square feet and improved with a one-story frame, one family dwelling".

12. Ashley Street is about a mile away from the property. It is Ashley Road which runs along the rear of the property.

13. The property actually sold is not situated on the corner of Ashley Road and route 309. The Highway Department closed in the front and part of a curve of the property by erecting a fence, which at one point is distant 10 feet from the dwelling.

14. The description in the agreement is misleading because the property fronts route 309, and not along Ashley Road. The rear is parallel to and along Ashley Road.

15. In September 1965 the Highway Department constructed a wire fence in front of the dwelling, and at one point, it is about 10 feet from it, so that there is now no access from the property to route 309.

16. On or about September 10, 1965, a deed with special warranty was prepared wherein defendants were grantors and plaintiffs were grantees, conveying

the entire property as described in deed recorded in deed book 1116, page 429. While this deed was prepared by plaintiffs' attorney, he did so as attorney for defendants.

17. At the time of closing in the office of the real estate agents, an error in the description was discovered; the deed purported to convey the condemned land as well. One of counsel for plaintiffs went to the Highway Department offices in Scranton and was told that the proper way to describe the property would be to include the description of the whole property and recite that "the premises are subject to the easement granted the Commonwealth of Pennsylvania on February 25, 1964 as outlined on map recorded in Luzerne County Map Book 20, page 7".

18. Actually, the Commonwealth did not condemn an easement. It condemned certain land outright. The map of the property taken is not to be found in map book 20, page 7, as recited in the deed to plaintiffs.

19. The "For Sale" sign erected by the real estate agents was in the front of the property, and not in the rear along Ashley Road.

20. The real estate agents, Messrs. Nobel and Craze, studiously avoided informing plaintiffs of the location of the front line of the property.

21. Both agents, Nobel and Craze, knew that the land between the dwelling and route 309 had been condemned by the Highway Department, but both kept that information from plaintiffs.

22. The presence of the fence would make the sale of the property more difficult and render it impossible for use for commercial purposes.

23. At the closing, agent Craze made no effort to change the idea in plaintiffs' minds that only an ice cream stand by the side of the house was taken by the Highway Department.

24. Defendants kept the grass cut in front, leading

plaintiffs to conclude that the lawn was part of the property sold, whereas, in fact, it was part of the land condemned by the Highway Department.

25. Defendant Cora Badman stopped the construction of the fence by the Highway Department in the summer of 1964. Again in August, 1965, she stopped it because she did not want plaintiffs to know the truth as to the location of the right-of-way line.

26. Defendant Cora Badman told their agent Craze that she had prevented the Highway Department from erecting the fence some time after the property had been sold to plaintiffs.

27. When the State began the construction of the fence, defendant Arthur Badman declared "there must be a mistake" and again he pointed to the line at the stake nine feet from the right-of-way.

28. Defendants never gave plaintiffs a map of the property until the day that they moved from the premises.

29. Plaintiffs would not have purchased the property had they known the truth as to the line in front of the property.

30. Plaintiffs asked for the return of their money as soon as they became aware of the location of the fence.

31. The attorney who drew the description could not draw the deed from the map.

32. Defendants, by their deed, sold something which they did not own, the land subject only to an easement.

33. The deed contains a special warranty.

34. Defendant Arthur Badman fraudulently represented to plaintiffs that the property fronted on route 309.

35. Plaintiffs relied upon the fraudulent representation of Arthur Badman as to the location of the side line adjacent to route 309.

36. Defendants were paid damages by the State for

the loss of the right to have their property abut on route 309.

## DISCUSSION

Plaintiffs contend that the sale is void because it is based on a "deliberate fraudulent misrepresentation on the part of the defendants, or upon a mutual mistake of fact".

There was no mutual mistake of fact, because defendants knew at all times that their property, following condemnation of part thereof, was no longer open to route 309.

The right of access to and from route 309 was a property right of which the owners of the property abutting the highway, defendants, could not be deprived without just compensation. When that right of access was taken from them, they were amply paid by the State, and, therefore, they knew that the remainder of the property no longer adjoined route 309: Wolf v. Department of Highways, 422 Pa. 34, 39.

From the very beginning of this entire transaction, the conduct of all parties connected with the sale is questionable.

To begin with, the agents engaged by defendants to sell the property must have known of the condemnation, and they certainly had been informed by defendants as to where the line adjacent to route 309 was located. This is evident from the fact that they advertised the property as being located at an intersection, but described it according to area, and they contended that the sale was according to area. This is, to say the least, most unusual in the case of the sale of a dwelling property.

By intersection, we mean the area bounded by prolongation of property lines along two streets: Kienlen v. Holt, 106 Cal. App. 135, 288 Pac. 866.

In section 102 of the Act of April 29, 1959, P. L. 58, 75 PS §102, the word "intersection" is defined as being

the "area embraced within the prolongation of the lateral curb lines or, if none, then the lateral boundary lines of two (2) or more highways which join one another at an angle whether or not one (1) such highways crosses the other".

Agent Nobel admitted that he listed the property as being at an intersection, well knowing that there was no frontage on route 309. He also admitted that he was aware that the State had taken the front portion of the property and was erecting a fence in front of the house.

His associate Craze also knew that the front of the property had been condemned, and he admitted that defendant Arthur Badman, in his presence, pointed to the stake which he said was nine feet away from route 309 as being in the front line. He, too, admitted having advertised the property as being at an intersection.

When they prepared the agreement of sale to plaintiffs, they described the property as being located at a corner.

According to Webster's New International Dictionary, 2d ed., a corner is "the point or place where two converging lines, *sides* or edges meet; . . . The place of intersection of two streets".

A "corner" is a point where two lines join: Harper v. Temple Lumber Co., 290 S. W. 530, 531, (Tex.)

In this case, there is only one street: it does not intersect route 309. The property does not have two street sides which intersect. Not only did the Highway Department locate the side line close to the building, but they also ran a line along a curve to Ashley Road, thus encircling the property and completely preventing access to route 309.

When the discrepancy was discovered, agent Craze admitted that he could have said, "This is as much a surprise to me as it is to you", and "I hope that you

don't think I knew anything about this". Actually, we believe the agents knew all about the exact location of route 309.

And we are satisfied that the agents participated in a scheme to keep the truth as to the location of the boundary line of route 309 from possible purchasers.

When plaintiffs came on the premises, Badman pointed generally in a northerly direction as the course of the line. Mr. Horridge testified that at the same time, he pointed to a post in the side line of route 309, which he declared was between nine and 10 feet from route 309. This incident of the post he denied.

In this respect, our facts are quite similar to those in Stone v. Farnell, 239 F. 2d 750 (9th Cir.), in which the seller pointed out the purported location of a boundary, stating erroneously: " 'It runs right along here, south of the guest house and south of the carport' ". The court stated positively that "the owner of real property is under a duty to inform himself of the true boundaries of the land he seeks to sell".

In several cases, the courts of California have held that the owner of real estate, in the absence of facts showing the contrary, is presumed to know the boundaries and areas of his land, and a buyer is warranted in relying upon his representation in respect to such facts: Nathanson v. Murphy, 132 Cal. App. 2d 363, 282 P. 2d 174; Shearer v. Cooper, 21 Cal. 2d 695, 134 P. 2d 764; Edwards v. Sergi, 137 Cal. App. 369, 30 P. 2d 541.

In Starwich v. Ernst, 100 Wash. 198, 170 Pac. 584, the statement that a two-story building was upon the lot, although not wilfully false or made with intent to deceive plaintiff, was held to be an actionable misrepresentation, where part of the building extended into the street.

In Lou v. Bethany Lutheran Church, 168 Wash. 595, 13 P. 2d 20, the court declared:

"It has become the settled law of this state that, when a vendor undertakes to point out lands or boundaries to a purchaser, he must do so correctly. He has no right to make a mistake except under the penalty of having the contract rescinded or responding in damages. The fraud of the vendor in such a case consists in representing as true, with knowledge that it is being relied upon as true, that which he did not know to be true".

In Lee v. Bielefeld, 176 Wis. 225, 186 N. W. 587, the court stated:

"It has long been the settled law in this state that, when a vendor undertakes to point out or state to a purchaser the boundaries or situation of the property he is selling, he is bound to do so correctly, and, when the purchaser is ignorant of the location, he has the right to rely on the positive statement of the vendor, and to hold him responsible whether the false representation was intended or not".

In Jack v. McConkey, 208 Ill. App. 84, the court held that when a vendor undertakes to point a boundary of land to a purchaser, he is obliged to point it out correctly.

The single misrepresentation as to the boundary line by defendant-husband suffices to establish the element of fraud in the case: Stone v. Farnell, supra.

However, we point out that the wife also participated in the scheme. She had stopped the Highway Department from constructing the fence sometime in 1964, and when they again endeavored to construct the fence after the agreement with plaintiffs was signed, she stopped them once more. Why? It certainly was to keep plaintiffs from knowing the truth about the line.

She cut the lawn and kept everything shipshape in front of the property a considerable distance from the dwelling. This also, in our opinion, was calculated to

mislead plaintiffs as to the exact location of the line in front of the home.

Plaintiffs wanted the property for commercial use along route 309, and they asserted that under no circumstances would they have purchased the property had they known the truth about the front line.

Mr. Badman insisted that plaintiffs should have read the map which he gave them the day that they moved from the premises, and yet he admitted that he himself could not read it.

The deed to plaintiffs refers to the wrong map book and page as to the location of the description of the "easement" condemned by the Highway Department. Even if they had given the correct book and page, such public record would not bind plaintiffs, as they are not required to conduct a search: Hargrove v. Henderson, 108 Cal. App. 667, 292 Pac. 148; Jackson v. Meinhardt, 99 Cal. App. 283, 278 Pac. 462; Charbonneau v. Rokicki, 278 Mass. 524, 180 N. E. 307; Hoock v. Bowman, 42 Neb. 80, 60 N. W. 389.

We conclude that "Nondisclosure of the fact that land sold as a home site and standing near a public way is in fact separated from the highway so that there is no access to or from it has been held to be a concealment of such a character as to be capable of vitiating the sale": 91 C. J. S. 925.

From the findings of fact, we reach the following

### Conclusions of Law

1. Defendants failed in their duty to point out the correct boundary of the property in front of the house.

2. The sale must be set aside because of the fraudulent representations as to the boundaries of the property by defendants and their agents.

3. There has been a failure of consideration: Plaintiffs are not receiving what the deed purports to convey.

4. Plaintiffs are entitled to relief.

## Decree Nisi

It is ordered, adjudged and decreed as follows:

1. Defendants are to return the sum of $12,000 to plaintiffs within 10 days from the date hereof.

2. Upon receipt of said payment, plaintiffs are to reconvey the property to defendants.

3. Defendants are to pay all costs.